In matter of highway.

IN MATTER OF A PUBLIC HIGHWAY, LAID OUT IN THE COUN-
TIES OF BERGEN AND HUDSON.

1. If a turnpike company, whose charter has expired by its own limitation,
   sell their road and bridges to an individual, all the franchises connected
   therewith are destroyed, and the property is held as private property,'
   unprotected by any contract or franchise in the charter.
2. If a road already formed and bridges already built be owned by an indi-
   vidual as private property, a public highway cannot be laid over them
   by surveyors, so as to take the improvements for the use of the public.
   The word land, in the road acts of New Jersey and in the exception in
   the constitution, means land in its popular sense, without the improve-
   ments upon it.
3. Costs cannot be awarded on a sucessful motion to set aside a return of sur-
   veyors as laying out a road; there is no statute in settled practice to au-
   thorize it.  (note.)

In matter of highway.   On motion to set aside the proceed-
ings of surveyors.

Six surveyors of the highways of the counties of Bergen and
Hudson, appointed by this court, at April term, 1848, on appli-
cation of Albert R. Terhune and others to lay out a public high-
way in the counties of Bergen and Hudson, made a return, lay-
ing out a highway as applied for.   To the recording of this re-
turn, Abraham J. Berry, an owner of lands through which the
road was laid out, filed a caveat, and, at the term of July, ob-
tained a rule upon the applicants to show cause why the return
and proceedings of the surveyors should not be set aside, with
leave to take affidavits.

No grounds for setting aside the return were assigned in the
rule or by any paper in the cause, they are to be gathered from
the arguments of the counsel and the opinions of the judges.
Both parties took depositions, and offered exhibits under the rule
for that purpose.

The notices of the application for the appointment of sur-
veyors did not allege, or show on their face, that ten of the
applicants were residents and freeholders in Bergen and ten
in Hudson, but were signed with twenty names, alleging them-
selves to be freeholders and residents in Bergen and Hudson;
the affidavit annexed proved that ten of them were freeholders
and residents of Bergen and the other ten of Hudson.   This
notice did not contain any particular description of the route

of the road applied for; it gave the beginning and ending points with certainty, and described the road as "thence to run southeasterly and southerly, in said townships of Lodi, Harrison, and North Bergen," to the ending stake. Objection was made by the caveator, on the application for the appointment of surveyors, to the sufficiency of the notice in the designation of the residence of the applicants, and to the sufficiency of the description of the route of the road to be laid out. But the court, after hearing counsel, held them sufficient, and appointed the surveyors.

By the proof it appeared that Edo Vreeland, one of the surveyors appointed, and who signed the return, had before his appointment expressed his opinion in favor of laying out the road; that at town meeting, in 1848, he had told a voter that he desired to be elected again (he having been a surveyor for thirteen years) for the purpose of laying out this road; that his house was, and had for years been kept as a public house on the road to be laid out, and that the surveyors, on the day of laying out the road, met and were entertained at his house.

It further appeared that the road laid out by the surveyors passed, for almost its whole length of five miles, over the route of the turnpike road formerly constructed by " the New Barbadoes Toll Bridge Company," crossing the remains of former bridges built over the Hackensack river and Berry's creek, two navigable streams, and passing through one side of the remains of a toll house standing near the shore below high water mark on the Hackensack river; that the bridges had become dilapidated, were partly thrown down, and had for some time been impassable; that the frame and part of the weatherboarding of the toll house were standing, but that it was not inhabited or inhabitable; that the turnpike road had become impassable, its use had for one or two years been abandoned, and part of it had been enclosed by the persons to whom the land originally belonged.

The New Barbadoes Toll Bridge Company had been incorporated by an act passed February 16, 1816, (*Pam. Laws* 130) and their charter was to be void, unless the road was completed in — years from the passage of the act. By several

supplements, the time for completing the road was extended to February 18, 1843. The legislature did not further extend the time, and the road was not then completed ; but the bridges had been built, and part of the road completed, and had for years been travelled, the legislature having, by a special act, granted power to take toll on the road and bridges before completed.

The company, after the 18th of February, 1843, exercised none of the franchises granted by their charter; and by deed dated February 15th, 1843, reciting that their charter was about to expire on the 18th of that month by reason of their not having completed their road, they conveyed their road and bridges and all their real property to Abraham J. Berry, in trust for the benefit of the creditors and stockholders of the company. Abraham J. Berry, in pursuance of the trust, conveyed the road and bridges to John A. Berry by deed, dated May 28, 1844, for eight hundred dollars. Before the laying out of this road, the title of John A. Berry to the turnpike road and bridges had become vested in Abraham J. Berry, the caveator.

The road, as laid out by the surveyors, extended in the enclosure of Edo Vreeland, at the northwest corner of his farm, for the distance of ten or twelve feet; but, by the enrollment of a decree in chancery, it was shown that the title of this gore was not in Edo Vreeland, but had vested in the company, and was now in Abraham J. Berry.

It was proved by the surveyors that they hesitated about laying out the road, on account of the expense which the long and expensive bridges required would throw upon the county ; and that this objection was obviated by the assurances given to them during their deliberation by the counsel for the applicants, that these bridges would be built by R. Morrell, who was about organizing a company for that purpose, and would not involve the county in expense.

Stephen Kingsland, one of the surveyors, testified that he would not have laid the road there on the meadows, if it had not been that it could be made at a small comparative expense on account of the causeways built over the meadows on the route

taken, by the old company; that he thought the road was required by the public, and that the necessity was great enough to warrant the expense, but he would have been unwilling to incur it, because a great part of it would have fallen on the township of Harrison, where he lived, and he would have been taxed, and would have derived no benefit, as he lived in the other end of the township.

It further appeared that all the land taken by the road laid out on the route of the old turnpike, with the exception of three small parcels, had been given by the original owners to the turnpike company, for the purpose of having a road constructed upon it, and that these same owners had contributed to its construction by subscribing to the stock of the company.

The case was argued at January term, 1849, before the CHIEF JUSTICE and Justices NEVIUS, CARPENTER, and OGDEN, and held under advisement until October term.

*Vroom* and *W. Halsted*, for caveator, *Zabriskie*, for applicants for road.

*Vroom*, for caveator

I. It should appear on the face of the notices for the application that ten of the applicants reside in each county; this is required by the construction given to the act. 2 *Penn.* 665; 2 *Halst.* 36. The notice ought to show on its face that all the requirements of the law had been complied with; that it so appears in the affidavit is not sufficient.

II. The application is too general, it gives only the beginning and ending points and the general course. And in a road of five miles in length gives no other point, and does not mention two navigable tide rivers over which it passes.

III. The allegation in the return, that the notices of the surveyors meeting were signed and set up according to law, is not sufficient. It should show how many, and when and where put up.

IV. The description of the road in the return is too indefinite, in a road of five miles in length it gives courses and distances, and says, passing over lands of A. I. B., M. V. M., &c., without saying how far on each; it does not designate

In matter of highway.

how much is on old turnpike road, nor does it mention the bridges which are improvements.

V. This road is laid out over, and takes private improvements of great value; the road bed and bridges are expensive improvements, which by this laying out are attempted to be taken from the owner without compensation. The exception in the constition is, that *lands* may be taken as heretofore.

VI. Edo Vreeland should not have been appointed a surveyor; he was not impartial, he had expressed his opinion, solicited an election, and the value of his tavern depended on the laying out of this road. This entertaining the surveyors shows the interest he took in this matter.

VII. The inducements held out to the surveyors by the promise to build the bridge were improper. Surveyors must be left unbiassed in their judgments, to form them from the circumstances as they exist, and the land owner is entitled to the protection which the expense of making a road affords against its being laid out. 1 *Green* 176, *State* v. *Stites*.

*Zabriskie,* for applicants.

I. As to the first reason, it is a sufficient answer, that the act which prescribes the notice does not direct that the residence of the applicants should appear on it. *Rev. Stat.* 515, § 3. No reason of public policy or private justice requires it, and the courts will not legislate by adding new requisites, even if it should not be thought expedient so to amend the act. The practice in this court has been both ways; in ten years I find nine cases with county designated, and three without it.

II. As to the description of the road in the notices of application, it conforms exactly to the only direction in the road act relative thereto, it designates the beginning and ending points; and this was held by Kirkpatrick, C. J., to be the most proper description. 1 *South.* 31, *Matter of road.* Besides this matter as well as the first objection taken were fully argued before this court on the application for surveyors, and the court, after argument, consideration, and consultation, overruled both objections.

III. The road act makes the determination of the surveyors,

as to the notice of their meeting, conclusive, and the form in this return, in that respect, is the one universally used.

IV. As to the description of the road in the return, it is as definite as courses, distances, and monuments can make it. The improvements are not noticed in the *return*, the statute does not require it; in the annexed *map*, where the statute requires it, they are all marked down. *Rev. Stat.* 516, § 5.

V. As to the improvements taken, there are none taken that are forbidden by statute; the remains of the toll house is no dwelling house; a *dwelling house, ex vi termini*, is a house in which some one dwells; it is so settled in burglary and arson. 1 *Russell on Crimes* 799, 803. In the road act exception, it must at least be *habitable*, this was not; if this were a dwelling house, a single timber or one rod of stone wall remaining would make a dwelling house: besides, there is no proof that this ever was a dwelling house. By settled decisions before the constitution, other buildings, as a bark house, did not prevent the laying out a road. *State* v. *Stiles*, 1 *Green* 176. The true construction of this clause in the act, coming as it does in this and all preceding acts after the thirty-second and thirty-third sections respecting encroachments, would seem to confine it to them. The first introduction of this clause in the road act was in the act of March 17, 1774. *Allison* 389, § 5. It was then plainly confined to removing encroachments in old streets, the word " by " being where " or " now is. It was first changed in act of March 16, 1798, *Pat. Rev.* 327, and this alteration only extended it to highways *out of villages.*

If land could be taken in this way before the constitution it can still be so taken. As to the toll house and bridges, they are nuisances in navigable waters, which any one may abate; they are not to *be taken* for the road; but if they are in the way of a lawful road they may be removed by the proper authorities : the company, when their charter expired, properly ceased to maintain them, and they went to decay. As to the franchises of the company, they are forfeited; they do not pretend to exercise them; and the recital in their deed of February 15, 1843, that their charter was about to expire, con-

cludes them ; there could be no *quo warranto* against a company refusing to exercise or usurp franchises.

There is in this case a peculiar equity in taking the road bed of the old turnpike. That land was first given by the adjacent proprietors to the company, for the purpose of building a road on it; they subscribed stock for the same object: a road, not dividends, was their object. When the charter of the company expired, the lands *reverted;* company could not convey, they were only given and taken for a road, the company had only the easement. The whole line of the road was abandoned, and part of the lands were fenced in by the former owners.

VI. Edo Vreeland was not disqualified as a land owner, the record of the chancery suit shows that his *title* to all the land occupied by the road was out of him ; the other objections to him were addressed to the *discretion* of the court. *State* v. *Conover,* 2 *Halst.* 217, and that discretion must be exercised at the time of the appointment. *Rev. Stat.* 515. Either of them, if shown at that time, might have induced the court not to appoint him. His entertaining the surveyors, as he was an innkeeper, will be presumed to have been for compensation paid by them or the applicants.

VII. As to the influence of the offer of building the bridges, the court will not look into the motives of surveyors. Ewing, C. J., in *State* v. *Stites,* 1 *Green* 172. And this offer was not illegal, it was fair and just, not against any rule of law or principle of morals.

*Halsted,* for caveator, in reply.

The residence of the applicants is not mere matter of form. The objection to Edo Vreeland, if he had been bribed or hired for this object, could not have been taken by us at the appointment, if we did not then know it. This is not analogous to a challenge to a petit juror. A grand juror may be challenged afterwards.

[CHIEF JUSTICE. That point has recently been decided the other way in this court, and the case of *The State* v. *Rockafeller,* 1 *Halst.* 332, overruled.]

Land which once belonged to a corporation cannot be taken

for a road, even if the charter is gone. *State* v. *Demott*, 1 *Green* 156–7. The franchises of the company exist until forfeited by a decree of some competent court directly on the point. By the right of eminent domain corporate property or franchises may be taken on compensation rendered. 1 *Saxt.* 157; 6 *Howard* 507, *Bridge Co.* v. *Dix*, 17 *Conn.* 40, 45–7; 23 *Pick.* 360, *Water Power Co.* v. *Railroad Co.*; 7 *N. H. Rep.* 67; 11 *Ib.* 122; 15 *Verm.* 145; 11 *Pet.* 168; 3 *Met.* 380, *Dodge* v. *County Commissioners*; 5 *Ib.* 371, *Ashley* v. *Easton Railroad Co.*; 10 *N. H.* 247.

Under the old New Jersey road law, corporate property was never taken for roads, and in the constitutional exception *land* is to be taken in its popular acceptation. In West Jersey lands were at first only taken for roads upon compensation. *Leam. & Spicer* 440, § 18.

GREEN, C. J. The caveator in this case seeks to set aside the return of the surveyors—1st, on the ground of numerous irregularities in the proceedings, and 2d, because the surveyors had no authority to lay out the road in question. The last objection, as it lays at the foundation of the entire controversy, I propose to consider first.

The facts of the case, so far as they are material to the present inquiry, are briefly these: The road, as laid out by the surveyors, commences on the east side of the Passaic river, opposite Acquackanonck. It extends a distance of more than five miles, crossing two navigable streams (Berry's creek and the Hackensack river), and terminates on the island of Secaucus. Its entire length, with the exception of an inconsiderable portion near the beginning point, is laid out over the turnpike road and bridges constructed by "the New Barbadoes Toll Bridge Company." That company was incorporated by an act of the legislature, passed on the 16th day of February, 1816. They were authorized by their charter to construct a road four rods wide from the east of the Acquackanonck bridge to the Hackensack and Hoboken turnpike road, and to build bridges across Berry's creek and Hackensack river in the line of the road. As soon as the road and bridges should be

completed, the company were authorized, under a license for that purpose to be obtained from the governor of the state, to erect a turnpike gate across the bridge over the Hackensack river and to receive tolls. The charter contains further provision, that if the company should not within three years after the passing of the act commence making the road, and within ten years thereafter complete the road and bridge, the act should cease. By several supplements to the original act, the time for the completion of the work was extended from time to time until the 18th day of February, 1848. By a supplement, passed on the 18th of February, 1840, the company were authorized to receive tolls.

The company caused the bridges to be built over Berry's creek and the Hackensack river, and the road to be laid out and partially constructed. The road, however, was not completed within the time limited by the original act, or by the supplements, and the act of incorporation ceased on the 18th of February, 1843. On the 15th of February, 1843, before the determination of the charter, the company conveyed their turnpike roads and bridges, and the land occupied thereby, to Abraham J. Berry, upon certain trusts in the deed of conveyance specified. On the 25th of April, 1844, the trustee, in pursuance of the power reposed in him, sold the road, real estate, and bridges, conveyed to him by the company, at public vendue, for nine hundred and ten dollars, to John A. Berry, and by deed of conveyance, bearing date on the 25th of May, 1844, conveyed the same to the said John A. Berry in fee simple. By several subsequent conveyances, the title of John A. Berry vested in Abraham J. Berry, the caveator. The title of the said Abraham J. Berry to the said real estate, road, and bridges has not been divested, but remained in him at the time of laying out the road.

From this statement of facts, it is apparent that the case does not involve any violation of corporate franchises or infringement of charter rights. The charter of the company was forfeited. Their very existence was determined. The property taken was exclusively individual private property. The power of the state therefore, by virtue of the eminent

domain, to take and appropriate to public use corporate franchises, is not brought in question. The case, it must be admitted, stands entirely clear of that difficulty. It does not fall, therefore, within the principle of *the West River Bridge Company* v. *Dix*, 6 *Howard* 507. That case decides that a bridge owned by an incorporated company, having the franchise of taking tolls under a grant from the legislature, may be taken as a part of a public highway, and the franchise of the company destroyed by virtue of the eminent domain, without a violation of contract or an infringement of the constitution. Nor does the case come within the principle of *The State* v. *Demott* (2 *Green* 254), which decides that, under the law of this state, surveyors of the highways have no power to vacate a highway granted and confirmed by charter from the legislature.

The question presented is, whether a turnpike road or a bridge owned by a private individual, acquired by purchase or constructed for his private benefit, can be taken and appropriated, under the laws of this state concerning highways, to public use without just compensation? Whether such structures or improvements are *land*, within the meaning of that clause of the constitution which declares that "Private property shall not be taken for public use without just compensation; but *land* may be taken for public highways, as heretofore, until the legislature shall direct compensation to be made?" Whether regard be had to the origin of the law, the practice under it, or to sound principle, I am clear that the question must be answered in the negative. The familiar principle, that private property shall not be taken for public use without just compensation, is a dictate of natural justice. It is founded in natural law. It has its origin back of political constitutions.

The apparent departure in the legislation of this state from so clear a principle, had its origin in the practice of the proprietors, early adopted and uniformly adhered to, of including in every grant of land an allowance for highways. The amount of the allowance varied in the two provinces, but in each it was amply sufficient to meet all the probable requirements for

roads through a long period of time. In fact the allowance was such, that in many of the agricultural districts of the state, where lands are held under ancient grants, the surveys still contain more than the original grant, notwithstanding all the deductions that have been made for highways. The legislation had its origin at a period when the laying out of a highway over land was a benefit conferred, rather than a burthen imposed upon the proprietor. Under such circumstances, the taking of land for public roads was not a taking of private property for public use, within the appropriate sense of the term. The lands taken were in fact given to the grantee for public purposes; he paid nothing for them. The grantee was trustee; he stood seized in equity for the use of the public. When, therefore, a road was laid over the lands of a proprietor, nothing was in fact taken which was properly considered private property. Early legislation upon this subject must therefore have had regard to the taking of land in its more strict and appropriate sense, and not to structures or improvements upon it. Nor are there wanting expressions in the act which favor such construction. Roads are required to be laid out in such manner as to do the least injury to private property; and, by the thirty-sixth section of the act, it is enacted, that nothing in the act contained shall be construed to extend to narrowing, widening, or altering any street in any of the cities, towns, or villages of the state, or to pulling down or removing any dwelling house, market house, or other public building heretofore erected, and which may encroach on any highway. Without insisting upon such construction of this section as would prohibit the laying out of a highway upon or over any dwelling, the provision itself sufficiently indicates the general policy and spirit of the act, and the intention of the legislature in its enactment, and the practice under it is believed to have been in conformity with such construction. If a public highway has in any instance, in this state, been laid through or over a dwelling, such instances are certainly rare. No instance has fallen under my observation, nor, upon inquiry, have I heard of one; on the contrary, the disposition to avoid interfering with structures or improvements of any kind, and so to

carry out the act as to do the least injury to private property, has been such as to create, in many instances, serious public inconvenience in the laying out of roads. Bridges, turnpike roads, or other structures have not heretofore been taken for public highways, nor are they *land* within the meaning of the constitutional provision.

While there would be manifest impropriety in disturbing, without legislative authority, the practice of taking land for highways, "as heretofore," sanctioned as it is by the constitution, there would be a still more obvious impropriety in giving greater latitude to the practice, and in taking not only *land as heretofore*, but bridges, turnpike roads, canal banks, or any other private property for public use without compensation. It is the duty of the court to maintain the law as it stood at the adoption of the constitution, but not to extend its operation. If the materials for the construction of a bridge or a turnpike road be brought upon the ground, it is very clear that they could not be taken for public use without compensation, and it is difficult to perceive what new right the public acquire to them, after the owner had bestowed his labor upon them in constructing a road or erecting a bridge.

If an extensive landed proprietor or manufacturer should construct upon his own premises, for the use of his land, or his forge or other works, a plank road and bridge, may it be taken and appropriated to public use or a highway? May a highway be located upon the bank of a canal? I think these questions must be answered in the negative, and if so, it must be on the ground that such structures or improvements are not *land* within the meaning of the constitution.

It would certainly be a straining of the principle to declare that in the laying out of a highway, no structure, bridge, or road might be incidentally crossed or interfered with. A fair application of the principle warrants no such conclusion. But in the present case, although the application is entirely silent as to the existence of a previous road or bridge, it is clearly established by the evidence, and is not questioned, that the road is laid out a distance over five miles directly upon the turnpike road and bridges of the caveator, and that it was so

done with the design of taking the improvements of the caveator, and appropriating them to the public use; such an act is taking private property for public use without just compensation, and is alike unconstitutional and unjust.

It is no answer to the objection, that the road is in places impassable, and the bridge ruinous. The principle cannot depend upon the value of the property at stake. It is in evidence that these improvements cost many thousands of dollars; they were purchased by the caveator at a cost exceeding nine hundred dollars. They cannot, therefore, be pronounced valueless, and the fact that they are taken for the use of the public, is a strong indication that the public expect to derive a benefit, not from the *land* merely, but from the improvements of the proprietor. Mr. Kingsland, one of the surveyors by whom the road was laid out, expressly testified that he would not have felt justified in laying the road, if the turnpike had not been there. In other words, the laying out of the road was warranted, if not induced, by the fact, that the public would enjoy the use, not of the *land* merely, but of the *improvements* which the proprietor had made upon the land. If so, it is a dictate of law and of justice that he should be compensated for the property so taken.

Nor can it excuse the act, that the improvements are of little value to the individual, but will be of great utility to the public. It is infinitely better that the public should suffer a temporary inconvenience, than that sound principle should be sacrificed, or the safeguards of private rights trampled under foot.

Nor is it perceived that there is either truth or weight in the objection, that the bridges, being erected over navigable streams, are nuisances, and that, therefore, the caveator cannot complain of a violation of his property by their removal or appropriation to public use. The bridges were erected by the New Barbadoes Toll Bridge Company, under express sanction of law. The mere determination of the charter cannot convert a lawful erection into a nuisance. If it be an obstruction of the navigation of the river, it may be complained of as such, and relieved against. But it was originally a lawful

erection. The Toll Bridge Company had lawful authority to construct it, and title to the structure when completed. Their title to the structure was conveyed to, and vested in the caveator.

This road being laid, throughout almost its entire extent, over the turnpike road and bridges of the caveator, the return is unlawful, and must be set aside.

The conclusion to which I have arrived upon this point, renders it unnecessary to give any opinion at length as to irregularities in the proceedings urged before us as grounds for setting them aside. I do not see in any of them sufficient reason to authorise us to set aside the proceedings.

NEVIUS, J. Several reasons have been assigned, and urged before us, in support of the motion to set aside the return of the surveyors in this case. I concur in the views expressed by the Chief Justice on all the points discussed by counsel, except that which relates to the location of the road, and here I feel constrained reluctantly to withhold my concurrence.

It is objected to the return, that the surveyors have laid the road on and over a strip of land heretofore purchased by a turnpike company for the construction of a turnpike road, and through and over a building formerly used or designed for a toll house, and over a bridge erected many years since by the aforesaid company.

The facts, as they appear from affidavits taken under a rule of this court, are these : In the year 1816, a company was incorporated with power to extend the Paterson and Hamburgh turnpike to the Hudson river; but if the said road should not be completed within a certain time, prescribed by the charter, it was provided that the same should be forfeited, and all the rights and franchises, as granted to the company, should cease and become null and void. In pursuance of this charter, the company was organized, purchased the right of way from the landholders, on the whole or part of the route, erected the bridge and toll house in question, and made some progress in the construction of their road; but, failing to complete it according to the provisions of their charter, the same became

forfeited, and their franchises as a corporation ceased. The property thus acquired, consisting of the land, bridge, and toll house, was afterwards sold, and purchased by the caveator in this case, who now claims to hold it free from liability to be taken and occupied by the public for a public highway, unless just compensation shall first be made to him. The bridge is now in a dilapidated condition, and the house not only uninhabited, but uninhabitable.

The practice of taking lands of private individuals for public roads without compensation to the owners, has prevailed in the state of New Jersey from time immemorial, and, in the language of this court in the case of *The State* v. *Potts*, 1 *South.* 349, cannot at this day be questioned. It had its foundation, probably, in the grants of lands from the original proprietors, which uniformly contained an allowance of five per cent. for roads and highways. This practice, too, is fully recognised and sanctioned by the present constitution of the state. The sixteenth section of the first article declares that " lands may be taken for public highways, as heretofore, until the legislature shall direct compensation to be made." This has not yet been done.

The land, then, of private individuals may be taken for roads without compensation, according to immemorial usage and constitutional sanction. And land comprehends, not barely the soil, but all improvements of a permanent and substantial nature made upon it ; herbage, trees, fences, buildings, and the like, are all embraced in the term land. The power, therefore, to take private lands for public roads extends to all lands, however improved, unless it is limited by the practice prevailing before the adoption of the present constitution or by some legislative provision. Let us inquire, then, what was the limit to the exercise of this power before the constitution of 1844 ? By the act of the legislature relative to roads, surveyors are authorised to lay out a public highway over private lands, pursuant to an application for that purpose, if they should deem such highway necessary, and of this they are the judges. And in the exercise of that power, they are required so to locate it, as to them shall appear best calculated to pro-

mote public and private convenience, having regard to the best ground, the shortest distance, and the least injury to private property. These are the only statutory limits to their discretion. And if that discretion should be ignorantly or corruptly exercised, the act provides that chosen freeholders shall be appointed, at the instance of a party aggrieved, to review the proceedings of the surveyors, and affirm or set them aside, as they may' see proper. I know of no other restriction or limitation to this power. The act gives power to lay roads over private lands without compensation, and it does not limit the power to unimproved lands, nor does it define what improvements on land may or may not be taken for public use, further than that the act shall not extend to pulling down or removing any dwelling house, market house, or other public building, heretofore erected. If improved lands are to be exempted from the operation of this act, and are not liable to be taken for public roads, we may well inquire into the nature and extent of the improvement which will cause the exemption. Will the improvement of the soil, the erection of fences or an outbuilding, the planting of fruit or forest trees, the construction of walks and avenues, constitute such improvement as to exempt the land from necessary public use? I apprehend not. Such has never been the practice, nor do I understand it to be the law.

In the case of *The State* v. *Stites and others*, 1 *Green* 176, the court said, " there was good reason for the protection of a man's castle (his dwelling house), but there was no statute, nor any solid argument, which would render more sacred, or less liable to intrusion, a bark house or tan yard, than a field, an orchard, or a garden."

I know of no improvement upon land which, according to practice or according to law, will constitute a bar in New Jersey to its appropriation to a public highway, except a dwelling house, or market house, or other public building. I do not mean to say that this court would sanction the act of a board of surveyors, were they to lay out a public road over and upon the line of an established turnpike or railroad, belonging to an incorporated company, invested with the right of taking

tolls and burthened with the duty of keeping it in repair. Nor would we sanction the laying out a road through a public cemetery ; yet I apprehend that before this court is called upon to interpose its authority in such cases, and set aside the proceedings of surveyors, on the ground of an abuse of legal discretion, the chosen freeholders ought first to be called on to review those proceedings.

What is there, then, in this case to warrant the interference of this court with the return ? The land taken is to all intents private property, as much and no more so, than the adjacent lands. It is not now a public road nor a turnpike road, nor has it any franchise annexed to it. And what are the improvements that render it too sacred for public necessity ? A dilapidated bridge and a dilapidated building. These, in my opinion, are no legal impediments to laying out the road, nor any legal objection to the return. If the owner sees fit to remove the materials of which they are composed, and which now constitute their essential value, he has the legal right to do so.

But, it is said, he is entitled to compensation for this property before it can be devoted to a public highway. This is equivalent to saying, that whatever may be the public convenience or necessity for these lands, they cannot be taken at all for a public highway, for the law has made no provision for such compensation. What would be the extent of the compensation to be made? Would it be for the fee simple of the lands, or only for the use of the lands while occupied as a road ? If for the use only, is it to be an annual sum, or are the parties to guess at the probable period of such occupation? Who is to make the assessment, and who are to pay it; and, when made, where is the law requiring the owner to accept the amount assessed in satisfaction of the compensation claimed ? All these are serious questions, and must be answered before I can consent to set aside this return for this reason. I regret the necessity which constrains me to differ with my brethren on this point, but thinking as I do, I would not fulfil my trust were I to yield my opinion before I was convinced.

In matter of highway.

CARPENTER and OGDEN, Justices, concurred with the Chief Justice.

Return of surveyors set aside. (a)

(a) In this case a rule was entered, on part of the caveator, to set aside the return of the surveyors, with *costs*, to be paid by the applicant to the caveator. At the next term, *Zabriskie*, for applicant, moved to set aside so much of the rule as regarded costs, costs not having been ordered by the court. *Vroom*, for caveator, opposed the motion.

The court, upon deliberation, held that costs could not be awarded in such a case as this, it not being authorized by any statute or settled practice. Rule amended accordingly.

CITED *in Bell* v. *Gough*, 3 *Zab.* 679; *Mor. Can. and Bkg. Co.* v. *State*, 4 *Zab.* 65–68; *State* v. *Troth*, 5 *Vr.* 382; *State* v. *Seymour*, 6 *Vr.* 59.