SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court. In the interest of brevity, portions of an opinion may not have been summarized.

## State v. Omar Vega-Larregui (A-33-20) (085288)

**Argued March 15, 2021 -- Decided April 28, 2021**

**ALBIN, J., writing for the Court.**

As a temporary emergency response to the easy transmissibility of the deadly airborne coronavirus, the Supreme Court authorized grand jury presentations in a virtual format, first in a pilot program and later on a statewide basis. In this appeal, defendant Omar Vega-Larregui and various amici curiae organizations claim that the virtual grand jury format -- and therefore the lack of an in-person proceeding -- violates the right to a grand jury presentation and other constitutional provisions. They also claim that the Supreme Court does not have the constitutional authority to order temporary virtual grand jury presentations for the duration of the pandemic.

On March 9, 2020, Governor Philip Murphy declared a Public Health Emergency and State of Emergency in response to the COVID-19 pandemic. The Court canceled all new civil and criminal jury trials until further notice on March 12, 2020, and all grand jury sessions and the selection of new grand jury panels on March 17, 2020.

To keep the criminal and civil justice system functioning, by April 24, the Judiciary had turned to technology and conducted more than 12,000 virtual proceedings. The Court established the Working Group on Remote Grand Jury Operations to examine whether, and if so, how, grand jury proceedings could resume in a virtual format while in-person gatherings are suspended because of COVID-19. The Working Group recommended that grand jury operations resume in certain counties in a virtual format in a manner that upholds the solemnity and secrecy of those proceedings and safeguards the rights of defendants, victims, jurors, and the public.

On May 14, 2020, the Court issued an Order authorizing a virtual grand jury pilot program to begin in Bergen and Mercer Counties. The Order instructed that "[g]rand juries empaneled before March 16, 2020 and still within their term of service may reconvene in a virtual format." It further directed that the standard grand jury charge would be supplemented by a special charge and an oath of secrecy adapted to the virtual format. The supplemental charge reminds the jurors of the gravity of their obligation and warns that, if they violate their oath of secrecy or any other rule governing the grand jury proceeding, they could be held in contempt and face "serious consequences," including

1

potential fines and jail time. The May 14 Order also advised that the Judiciary would "provide restricted-use devices (laptops or tablets) and related items" to any grand juror who is "able to participate in virtual proceedings but requires technological support" and would give training to the grand jurors "on the virtual courtroom process."

In June 2020, the Court expanded the two-county grand jury pilot program to include virtual grand jury selections and authorized virtual State Grand Jury proceedings. On July 24, 2020, the Court took the virtual grand jury pilot program statewide. In-person grand jury selection and sessions remain suspended.

As of January 29, 2021, the Judiciary had provided over 150 tablets (with broadband internet capacity when necessary) to allow potential jurors to participate in virtual grand jury selections and jurors to participate in virtual grand jury sessions. Any grand juror without access to a computer or tablet is provided one by the Judiciary. Jurors serving on State Grand Juries are instructed to interrupt or wave at their screens if they have any technical problems, and Deputy Attorneys General and grand jury staff monitor grand jurors' screens to assist with any problems.

Judiciary staff, moreover, ensure that grand jurors comply with the secrecy requirements of virtual grand jury sessions. Before each session, a staff member checks in with the jurors, has them perform with their electronic devices a 360-degree scan of their environments to confirm the privacy of their locations, and reminds them to turn off their cell phones or other devices.

In August 2019, defendant was arrested and charged with three drug-related offenses and with two disorderly persons charges. A Superior Court judge placed defendant on pretrial release. On February 13, 2020, a twenty-three-person grand jury panel was selected. The grand jury convened in person for orientation and for three sessions in February and March. Further sessions were canceled due to the pandemic.

On June 18, 2020, the grand jury reconvened in a virtual format. Beforehand, the jury manager inquired of all of the grand jurors whether they had the capacity to fulfill their service in virtual sessions, and five grand jurors were given tablets with internet capacity to ensure their continued service. Judiciary staff then assisted all grand jurors with a Zoom trial run, and the grand jurors received further instructions at an orientation. Over three sessions in June and early July, they heard eight presentations.

On July 9, 2020, the grand jury met for its fourth Zoom session, at which the prosecutor presented defendant's case. Before each virtual session, the grand jury staff conducted a check-in process with each juror. As part of that process, using their computers or tablets, grand jurors were required to perform a 360-degree scan of their location to assure staff of the privacy of their environment. In addition, at each session, the jurors were administered the supplemental oath of secrecy.

2

The Court reviews in detail the presentation of the case against defendant, including questions asked to confirm whether the jurors had questions or technical issues. After some questions, the grand jurors were asked to raise their hands; after others, a lack of response was treated as agreement. At certain points, people speaking were recorded as "unidentified speakers." After deliberating, the grand jury indicted defendant on four counts. The grand jury foreperson conducted pre- and post-deliberation technology checks to ensure that the grand jurors had not experienced any technical problems that affected their ability to hear and/or observe the proceedings or their ability to deliberate and vote.

Defendant pleaded not guilty and later moved to dismiss the indictment on the basis that the virtual grand jury presentation did not "adhere to constitutional norms" and that the State failed "to present clearly exculpatory information" during the presentation. More particularly, defendant argued that this Court exceeded its constitutional rulemaking authority by convening a virtual grand jury. On January 13, 2021, in accordance with Rule 2:12-1, this Court certified directly for its review only defendant's constitutional challenge to the grand jury presentation in the virtual format.

**HELD:** The Court has the constitutional authority to make rules and procedures for all courts of this state, including the grand jury; the Court's authorization of a virtual format for the selection of grand jurors and grand jury presentations during a lethal pandemic does not violate the State Constitution's separation of powers. There is no support for the facial constitutional challenge to the temporary use of the virtual grand jury during the current public health crisis, and virtual grand jury proceedings do not facially violate the fundamental fairness doctrine. In individual cases where a defendant claims that an alleged error or defect undermined the fairness of the proceeding, a challenge may be mounted. But in this case, no error undermined the integrity of the grand jury proceeding; nor is there a basis for the dismissal of the indictment.

1. Article I, Paragraph 8 of the New Jersey Constitution guarantees that "[n]o person shall be held to answer for a criminal offense, unless on the presentment or indictment of a grand jury." The Court traces the history of the right to a grand jury presentation and the roles that grand juries play in the criminal justice process. The Court's temporary suspension of in-person grand juries and jury trials was a public health imperative, but that suspension delays the criminal justice process with serious implications for the accused, whether detained or released pretrial, and the State. The question is whether all of the essential attributes of the right to a grand jury presentation can be preserved through a virtual format so that the grand jury can function and fulfill its historic purpose in the midst of an unprecedented public health emergency. In answering that question, it must be remembered that the framers of our State Constitution, like the framers of the Federal Constitution, created a founding charter "intended to endure for ages to come, and consequently, to be adapted to the various crises of human affairs." See McCulloch v. Maryland, 17 U.S. 316, 415 (1819). (pp. 28-32)

3

2.  The grand jury is a judicial, investigative body, serving a judicial function and is an arm of the court.  In New Jersey, the Judiciary exercises supervisory authority over grand juries to ensure that grand jury proceedings are fundamentally fair.  See N.J. Const. art. VI, § 2, ¶ 3.  The Court's constitutional administrative authority extends to the power to issue rules and directives governing the grand jury and cannot be circumscribed by legislation.  Grand juries are also the subject of legislation that, in many instances, overlaps with the court rules, and the Court acts with restraint when such legislation advances a significant governmental purpose and does not interfere with the Court's administration of the court system.  Here, in authorizing grand juries to operate in a virtual format for a temporary period during an unprecedented public health emergency, the Court is exercising a quintessential judicial power that is not in any way in conflict with legislative enactments concerning the grand jury.  Where a grand jury convenes is a matter of procedure; internet access and technological know-how are not qualifications for jury service, see N.J.S.A. 2B:20-1, in light of the Judiciary's provision of internet access, equipment, and technological support to the jurors.  (pp. 32-37)

3.  Defendant and his supporting amici allege that the very nature of a virtual grand jury session is incompatible with the secrecy requirements mandated by Rule 3:6-7 and N.J.S.A. 2B:21-3.  But one of the foundations of our jury system is that the jury is presumed to follow the trial court's instructions.  Grand jurors are given repeated reminders about the sanctity of the proceedings and serious penalties they would face for a violation of their oath of secrecy, and Judiciary staff monitor compliance.  Defendant and amici have set forth no basis for concluding that virtual grand jurors are less trustworthy than other jurors.  (pp. 37-39)

4.  To establish a prima facie claim that the grand jury selection process violated the fair-cross-section requirement or the right to equal protection, a defendant must show substantial underrepresentation of a constitutionally cognizable group.  Defendant and amici have provided no evidence that the grand jury in this case did not represent a fair cross-section of the community.  Not only has the selection process remained largely unchanged, but the grand jurors here were selected when in-person grand juries were still in session.  Had the Court not followed health-safety protocols and kept in place in-person grand juries during the pandemic, it is not likely that vulnerable populations, such as the elderly and those with underlying conditions, would have appeared for service at the risk of their lives.  In-person grand juries -- not virtual grand juries -- would have likely caused the underrepresentation decried here.  New Jersey has not been alone in crafting temporary remedies -- consistent with constitutional rights -- to keep the criminal justice system moving as new cases mount and old cases stagnate; five of the seventeen other states with grand juries have acted likewise.  (pp. 40-43)

5.  That New Jersey used a pilot program to ensure the efficacy of virtual grand juries did not create an impermissible classification and advanced a legitimate constitutional objective, thus satisfying the rational-basis test for such a program.  (pp. 44-45)

4

6. Virtual grand jury proceedings comply with the essential tenets of the fundamental fairness doctrine. Defendant and amici point out the various technological problems that can arise during a virtual grand jury proceeding -- or any virtual proceeding for that matter -- and claim that a virtual proceeding "does not capture all of the cues so vital to judging credibility." But grand jurors are extensively trained to participate in virtual grand jury sessions and advised to report technical problems to Judiciary staff. And Judiciary staff and prosecutors patrol and monitor the virtual grand proceedings to detect and correct technological issues. As to credibility determinations, judges make them in remote proceedings in many contested matters, and the grand jury process is not a mini-trial where issues related to credibility are decided. Because the virtual process may not be perfect does not mean that it is not mostly effective or unconstitutional. Certainly, technological glitches or defects will require individually tailored solutions. A defendant will not be without a remedy if such problems render grand jurors not present or informed about the evidence during a virtual session. (pp. 45-49)

7. Turning to the virtual grand jury proceeding in this case, a review of the transcript leads the Court to conclude that, viewed in its entirety, the proceeding did not violate the fundamental fairness doctrine or defendant's constitutional right to a fair grand jury presentation. At times, as in typical in-person grand jury presentations, the prosecutor relied on silence as an answer. That was offset here by the training the jurors received, the monitoring by Judiciary staff, and the foreperson's pre-deliberation check. But in the future, to remove any doubt about a virtual grand juror's response to a question, the prosecutor should require a clear indication for the record, such as an audible response or a showing of hands. As to comments by an "unidentified speaker" about whether the jurors could see the indictment, the record, the jurors' experience, and the foreperson's post-vote technology check refute the contention that those comments reveal that the jury could not see the indictment. Nevertheless, going forward all persons speaking on the record should identify themselves or be identified. Everyone participating in the virtual grand jury process should remember that the record must clearly reflect who is speaking and the responses to any questions. All in all, defendant received a grand jury hearing that comported with basic tenets of fundamental fairness and the constitutional right to a fair grand jury presentation. (pp. 49-52)

8. Virtual grand juries are a temporary measure invoked to meet an extraordinary, life-threatening public health crisis, and the Court reviews relevant statistics. (pp. 52-54)

**The motion to dismiss the indictment is DENIED, and the matter is REMANDED to the trial court.**

**CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, PATTERSON, FERNANDEZ-VINA, SOLOMON, and PIERRE-LOUIS join in JUSTICE ALBIN's opinion.**

5

SUPREME COURT OF NEW JERSEY

A-33 September Term 2020

085288

State of New Jersey,

Plaintiff-Respondent,

v.

Omar Vega-Larregui,

Defendant-Appellant.

On direct certification by the Supreme Court from
the Superior Court,
Law Division, Mercer County.

| Argued | Decided |
| --- | --- |
| March 15, 2021 | April 28, 2021 |

John S. Furlong argued the cause for appellant (Furlong
and Krasny, attorneys; John S. Furlong, on the brief).

Randolph E. Mershon, III, Assistant Prosecutor, argued
the cause for respondent (Angelo J. Onofri, Mercer
County Prosecutor, attorney; Randolph E. Mershon, III,
of counsel and on the brief).

Matthew S. Adams argued the cause for amicus curiae
Association of Criminal Defense Lawyers of New Jersey
(Fox Rothschild, attorneys; Matthew S. Adams, of
counsel and on the brief, and Marissa Koblitz Kingman
and Marc M. Yenicag, on the brief).

Brian J. Neary argued the cause for amicus curiae New
Jersey State Bar Association (New Jersey State Bar

Association, attorneys; Kimberly A. Yonta, President, of counsel, and Brian J. Neary and Christopher J. Keating, on the brief).

Carol M. Henderson, Assistant Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (Gurbir S. Grewal, Attorney General, attorney; Carol M. Henderson, of counsel and on the brief).

JUSTICE ALBIN delivered the opinion of the Court.

The Constitution must operate not just in the best of times, but also in the worst of times. The framers of our Federal and State Constitutions established a structure of government and system of justice to endure for the ages -- even through crises and perils they could not have envisioned. The fundamental rights guaranteed by our Constitution have been stress-tested during a civil war, two world wars, an economic depression, and now a once-in-a century pandemic.

The question in this case is whether, in the throes of the current pandemic, we have been faithful to one of those rights provided in our State Constitution -- that "[n]o person shall be held to answer for a criminal offense, unless on . . . indictment of a grand jury." N.J. Const. art. I, ¶ 8.

Beginning in March 2020, the public health threat of COVID-19 became a dire reality for the residents of New Jersey. As of March 9, 2020, there were eleven reported presumed positive cases of COVID-19 and no reported deaths

in this state.  Just two months later, as of May 5, there were over 130,000 positive cases that resulted in at least 8,244 deaths and mounting hospitalizations.  The easy transmissibility of this deadly airborne coronavirus led the Governor to exercise emergency powers to limit public gatherings and the Supreme Court to issue public-safety Orders temporarily suspending jury trials and grand jury presentations.  Requiring grand jurors, particularly older ones and those with underlying conditions, to appear in person in a forum where social distancing was not practicable would have recklessly put at risk the lives of those willing to perform their civic duty.

Without grand jury presentations, defendants subject to pretrial detention or pretrial release would have been denied their right codified in Article I, Paragraph 8 of the New Jersey Constitution.  As a temporary emergency measure, the Supreme Court authorized grand jury presentations in a virtual format, first in a pilot program and later on a statewide basis.

Defendant Omar Vega-Larregui and various amici curiae organizations claim that the virtual grand jury format -- and therefore the lack of an in-person proceeding -- violates the right to a grand jury presentation and other constitutional provisions.  They also claim that the Supreme Court does not have the constitutional authority to order temporary virtual grand jury presentations for the duration of the pandemic.

3

The arguments advanced by defendant and amici are not supported by the record in this case. Indeed, the defects attributed to the virtual format are almost wholly based on supposition and speculation. To be clear, this Court has the constitutional authority to make rules and procedures for all courts of this state, including the grand jury, which is an arm of the court. Part three of the Rules of Court extensively details the procedures governing grand juries. Those procedures were adopted pursuant to this Court's constitutional rulemaking and supervisory authority. We reject the contention that this Court's authorization of a virtual format for the selection of grand jurors and grand jury presentations during a lethal pandemic violates our State Constitution's separation of powers.

This Court has utilized technology to preserve, not to undermine, the constitutional right of defendants to a grand jury presentation. The virtual grand jury format -- a temporary measure to meet a public health emergency -- has not sacrificed any core principle animating the constitutional right to indictment by grand jury. The selection of grand jurors for a virtual setting is no different than for an in-person setting. Every grand juror who does not have the technical capacity to participate is provided the necessary equipment and training by the Judiciary. Defendant and amici have presented no

4

evidence that those selected for grand jury service in a virtual setting do not represent a cross-section of the community.

The grand jurors in this case were drawn pre-pandemic, before the use of virtual grand juries, and sat for a period in person before transferring to a virtual format. Therefore, the general challenge to the virtual selection of grand jurors is not even applicable here.

The Judiciary has closely monitored the administration of the virtual format to ensure the integrity of the grand jury proceedings. We acknowledge that errors sometimes will occur in court proceedings, including in a grand jury presentation, whether in the in-person or virtual format. In individual cases where a defendant claims that an alleged error or defect undermined the fairness of the proceeding, a challenge may be mounted.

In the case before us, we do not see any error that undermined the integrity of the grand jury proceeding; nor do we see a basis for the dismissal of the indictment. Moreover, we do not find support for the facial constitutional challenge to the temporary use of the virtual grand jury during the current public health crisis. Accordingly, we hold that the presentation of defendant's case to a virtual grand jury did not violate his constitutional rights, and we remand to the trial court for further proceedings.

I.

A.

On March 9, 2020, Governor Philip Murphy declared both a Public Health Emergency and a State of Emergency in response to the COVID-19 pandemic -- a pandemic that, over the last year, has killed more than 22,500 residents of New Jersey and more than 560,000 persons in the United States.[1] See Exec. Order No. 103 (March 9, 2020), 52 N.J.R. 549(a) (Apr. 6, 2020).[2] COVID-19 is a highly contagious and deadly virus that is spread airborne from person to person, often by a cough, a sneeze, or even talking. It causes acute respiratory illnesses and has led to countless hospitalizations, patients hooked up to ventilators, and deaths -- and has left many survivors with long-term unresolved health issues.

New Jersey was at the epicenter of the pandemic in the early days of the outbreak. In the first two months after the issuance of the Governor's first executive order, more than 8,000 New Jersey residents had succumbed to

---

[1] See N.J. Dep't of Health, New Jersey COVID-19 Dashboard: Cases and Trends, https://www.nj.gov/health/cd/topics/covid2019_dashboard.shtml (last visited Apr. 21, 2021); Ctrs. for Disease Control & Prevention, COVID Data Tracker, https://covid.cdc.gov/covid-data-tracker (last visited Apr. 21, 2021).

[2] Pursuant to N.J.S.A. 26:13-3(b), Governor Murphy has extended the Public Health Emergency each month since, most recently on April 15, 2021. See Exec. Order No. 235 (Apr. 15, 2021).

COVID-19, and hospitals were inundated with patients infected by the virus. The Governor's initial executive orders required the closure of schools, day-care centers, and non-essential businesses, and curtailed large gatherings to slow the spread of the virus.  See, e.g., Exec. Order 107 (Mar. 21, 2017).

In response to this unprecedented public health crisis caused by the person-to-person spread of the virus, this Court on March 12, 2020 canceled all new civil and criminal jury trials until further notice, and on March 17 canceled all grand jury sessions and the selection of new grand jury panels.  In Omnibus Orders issued on March 27 and April 24, 2020, the Court continued the suspension of grand jury empanelment dates and grand jury sessions, and all new civil and criminal jury trials.

To keep the criminal and civil justice system functioning, by April 24, the Judiciary had turned to technology and conducted more than 12,000 virtual proceedings by video and telephone conferences, including motions, settlement discussions, arraignments, and detention hearings.  After issuing the April 24 Order, the Court established the Working Group on Remote Grand Jury Operations (Working Group) "to examine whether, and if so, how, grand jury proceedings could resume in a virtual format while in-person gatherings are

7

suspended because of COVID-19."[3]  Sup. Ct. of N.J., Notice and Order

-- Supreme Court Authorization of Virtual Grand Jury Pilot Program, at 1-2

(May 14, 2020).

"The Working Group recommended that grand jury operations resume in

certain counties in a virtual format in a manner that upholds the solemnity and

secrecy of those proceedings and safeguards the rights of defendants, victims,

jurors, and the public."  Id. at 2.  On May 14, 2020, the Court issued an Order

authorizing a virtual grand jury pilot program to begin in Bergen and Mercer

Counties.[4]  At the time, statewide, 1,400 defendants were detained pretrial in

county jails and many defendants were on pretrial release, all waiting for their

cases to be presented to a grand jury.

The Court's May 14 Order instructed that "[g]rand juries empaneled

before March 16, 2020 and still within their term of service may reconvene in

a virtual format."  It further directed that the standard grand jury charge would

---

[3]  The Working Group was composed of representatives from the Attorney General's Office and the Office of the Public Defender, designees of the County Prosecutors Association of New Jersey, the American Civil Liberties Union, the New Jersey State Bar Association, and the private defense bar, as well as judges and court staff.

[4]  From March to May 14, 2020, New Jersey courts had conducted "more than 23,000 virtual proceedings involving more than 189,000 participants."  Sup. Ct. of N.J., Notice and Order -- Supreme Court Authorization of Virtual Grand Jury Pilot Program, at 1-2 (May 14, 2020).

be supplemented by a special charge and an oath of secrecy adapted to the virtual format. The supplemental charge and supplemental oath of secrecy, in relevant part, instruct grand jurors that they must (1) participate from a private location and shield their computer or tablet from the view of others and, unless alone, use headphones or earbuds so that others cannot overhear the proceedings; (2) "not allow other persons to see, hear, or otherwise observe the grand jury proceeding"; (3) advise the "prosecutor immediately if [they] believe someone can see or hear the proceeding" or if they "have a technical problem, such as loss of audio or video"; (4) not communicate with other grand jurors except during deliberations; (5) not communicate or share information with anyone, at any time or through any medium, about the grand jury proceeding; and (6) not audio- or video-record, photograph, or broadcast the proceedings, or allow anyone else to do so.[5]

The supplemental charge reminds the grand jurors of the gravity of their obligation and warns that, if they violate their oath of secrecy or any other rule

---

[5] At the Court's request, Acting Director of the Administrative Office of the Courts Judge Glenn A. Grant prepared the supplements to the jury charge and oath of secrecy.

governing the grand jury proceeding, they could be held in contempt and face "serious consequences," including potential fines and jail time.[6]

The May 14 Order also advised that the Judiciary would "provide restricted-use devices (laptops or tablets) and related items" to any grand juror who is "able to participate in virtual proceedings but requires technological support" and would give training to the grand jurors "on the virtual courtroom process."

The May 14 Order stated that the remote grand jury format would proceed "only with the consent of the defendant." It quickly became apparent, however, that the consent requirement had "inhibited bringing cases before . . . ready grand juries." Additionally, in the three weeks preceding June 4, the number of defendants detained pre-indictment had increased from 1,400 to 1,540. In view of the increasing number of criminally charged defendants

---

[6] A judge gives the traditional charge and supplemental charge to the grand jury before it convenes for the first time in a virtual format. At each subsequent session, the prosecutor is expected to remind the grand jurors of the requirements of maintaining secrecy, preventing access by others, and never photographing, recording, broadcasting, or otherwise sharing records of the grand jury proceeding. The grand jurors are also advised again of the criminal consequences of violating the oath of secrecy.

A Directive was issued on September 30, 2020, clarifying the "operational requirements for administration of the supplemental grand jury charge and oath [of secrecy]" for grand jurors empaneled during the virtual phase.

detained or released and awaiting a grand jury presentation, on June 4, 2020, the Court declared that remote grand jury sessions would proceed without a defendant's consent.

In June 2020, the Court expanded the two-county grand jury pilot program to include virtual grand jury selections and authorized virtual State Grand Jury proceedings. On July 24, 2020, the Court took the virtual grand jury pilot program statewide, announcing that grand jurors in participating counties would "be summoned for new grand jury selections starting on or after September 21, 2020." Over the next several months, Passaic and Atlantic Counties joined the ranks of vicinages conducting virtual grand jury proceedings.

By October 8, 2020, in-person grand jury sessions had been suspended for six months and the number of defendants detained in county jails awaiting a grand jury presentation had climbed to more than 2,700 (a number excluding defendants on pretrial release) -- and there was no possibility of a presentation except in those counties conducting virtual grand juries. That day, the Court "announce[d] a comprehensive plan to ensure that all counties have a grand jury panel equipped and ready to convene in a virtual format" by December 1, 2020.

11

We also authorized Assignment Judges and County Prosecutors to convene in-person grand juries in accordance with public safety guidelines and Judiciary policies. That plan ran aground just a few weeks later as a second deadly wave of COVID-19 swept over New Jersey and the nation, rendering in-person grand jury sessions a public health hazard. Accordingly, on November 16, 2020, the Court again suspended in-person grand jury proceedings and directed that all grand jury panels continue to convene in a virtual format.

In-person grand jury selection and sessions remain suspended as of this Court's most recent Omnibus Order. Sup. Ct. of N.J., Eleventh COVID-19 Omnibus Order (Mar. 23, 2021). Virtual grand juries are now convened in all twenty-one counties and have returned indictments, no-bills, and partial no-bills in the course of more than 6,000 presentations.

B.

Certifications submitted by the Judiciary's statewide Manager of Jury Programs Brian McLaughlin; the Mercer Vicinage's Jury Manager Dalia Seidl; and Deputy Attorney General and Acting Attorney Supervisor of the State Grand Jury Mallory Shanahan collectively aver that (1) no person summoned to serve on a virtual grand jury is excluded because of lack of the necessary technology; (2) grand jurors in need of technological equipment are provided

12

with tablets by the Judiciary for temporary use; (3) all grand jurors are trained to fully and effectively participate in the virtual format; (4) virtual sessions are closely monitored to ensure that grand jurors comply with the grand jury's secrecy requirements; and (5) Judiciary staff provide assistance if grand jurors encounter technical difficulties hearing or participating in a grand jury session.[7]

According to McLaughlin, the "summoning of a pool of jurors for a [virtual] grand jury selection has remained largely unchanged" during the pandemic. Prospective grand jurors complete a standard qualification questionnaire either online or in hard copy; Assignment Judges or their designees address requests for disqualification or rescheduling of service; and requests for excusal because of financial hardship or childcare responsibilities are handled in the same standardized manner. "No juror has been excluded from selection or from serving on a virtual grand jury based on [a] lack of technology."

Vicinage Jury Management and information technology (IT) staff have provided "individualized training to summoned and selected jurors to facilitate

---

[7] In their briefs to this Court, the State attached McLaughlin's and Seidl's certifications and the Attorney General attached Shanahan's certification.

their participation in remote proceedings using Zoom."[8]  And all qualified jurors are provided the necessary technology to serve on virtual grand juries.

As of January 29, 2021, the Judiciary had provided over 150 tablets (with broadband internet capacity when necessary) to allow potential jurors to participate in virtual grand jury selections and jurors to participate in virtual grand jury sessions.  Also, as of that date, more than 1,000 grand jurors were serving on forty-five county-level virtual grand juries statewide, and more than 3,000 presentations had been made to virtual grand juries.  McLaughlin reported that no virtual grand jury selection or session had been breached or hacked, or had its technical security otherwise compromised.

Judiciary staff, moreover, ensure that grand jurors comply with the secrecy requirements of virtual grand jury sessions.  Before each session, a staff member checks in with the jurors, has them perform with their electronic devices a "360-degree scan of their environment[s]" to confirm the privacy of their locations, and reminds them to turn off their cell phones or other devices.

Deputy Attorney General Shanahan, the Acting Attorney Supervisor of the State Grand Jury since the shift to virtual proceedings, attested that the procedures identified by McLaughlin in his certification are largely followed

---

[8]  Zoom is a video-conferencing platform.  See Zoom, https://explore.zoom.us/meetings (last visited Apr. 20, 2021).

14

in State Grand Jury virtual selections and sessions.  "No one is excused for reasons relating to technological access or capability," and any grand juror without access to a computer or tablet is provided one by the Judiciary.  Jurors serving on State Grand Juries "are instructed to interrupt or [wave] at their screens if they have any technical problems," and Deputy Attorneys General and grand jury staff monitor grand jurors' screens to assist with any problems.

As of February 12, 2021, the Division of Criminal Justice had presented more than sixty cases to virtual State Grand Juries, cases "ranging from straightforward drug and weapons charges, to multi-defendant Human Trafficking cases."  Shanahan noted that jury pool statistics for the number of potential jurors available for virtual State Grand Juries are "not significantly different" than the number for in-person State Grand Juries during pre-pandemic times.

In Mercer County, Jury Manager Seidl certified that "[n]o juror has been unable to participate in virtual selection or virtual sessions based on a lack of technology" and that twenty-one grand jurors were provided the required technology to participate.  She described an "isolated instance early on in the process" where one grand juror who was having trouble with her audio asked her grandson for help "prior to the start of the session.  The Assistant Prosecutor conducting the session immediately noticed the presence of the

grandson, and directed that he leave the room, which he did." As of February 10, 2021, virtual grand juries in Mercer County had heard 208 presentations.

II.

A.

On August 22, 2019, a City of Trenton police detective arrested and charged defendant Omar Vega-Larregui in a complaint-warrant with third-degree possession of a controlled dangerous substance (cocaine), N.J.S.A. 2C:35-10(a)(1); second-degree possession of cocaine with intent to distribute, N.J.S.A. 2C:35-5(b)(2); second-degree possession of cocaine with intent to distribute within 500 feet of a public park, N.J.S.A. 2C:35-7.1(a); and the disorderly persons offenses of resisting arrest, N.J.S.A. 2C:29-2(a)(1), and obstructing a lawful investigation, N.J.S.A. 2C:29-1. Two days later, a Superior Court judge placed defendant on pretrial release.

On February 13, 2020, the Mercer County Criminal Presiding Judge selected a twenty-three-person grand jury panel in the Mercer County Courthouse. The grand jury convened in person for orientation on February 20, 2020 and for sessions on February 27, March 5, and March 12, 2020. Further sessions were canceled due to the pandemic until this Court's introduction of the virtual grand jury pilot program.

16

On June 18, 2020, the grand jury reconvened in a virtual format. Before doing so, however, Dalia Seidl, Jury Manager for the Mercer Vicinage, inquired of all of the grand jurors, by telephone or email, whether they had the capacity to fulfill their service in virtual sessions. Only one grand juror asked to be excused, and that was because she had moved to another county. Five other grand jurors expressed a "willingness to serve but indicated that they lacked reliable personal technology to participate in virtual sessions." To bridge the digital divide, the Judiciary made available to those five grand jurors tablets with internet capacity to ensure their continued service.

Judiciary staff then assisted all grand jurors with a Zoom trial run. On May 20, 2020, the Judiciary also conducted an orientation session and required each grand juror "to demonstrate the capacity to use the technology, to see and hear the proceedings, to communicate with [Judiciary] staff and each other, and to indicate if they experienced any difficulties or otherwise required assistance." In addition, the grand jurors were given technical instructions and contact information for the Mercer Vicinage jury and IT staff if they encountered any technical problems. At the orientation session, the Criminal Presiding Judge administered to the panel the supplemental grand jury charge and supplemental oath of secrecy.

17

The grand jury convened for virtual Zoom sessions on June 18, June 25, and July 2, 2020 and heard eight presentations during which it returned indictments and partial no-bills.[9] On July 9, 2020, the grand jury met for its fourth virtual Zoom session, at which the prosecutor presented defendant's case.

Before each virtual session, the grand jury staff conducted a check-in process with each juror. As part of that process, using their computers or tablets, grand jurors were required to perform a 360-degree scan of their location to assure staff of the privacy of their environment. In addition, at each session, the grand jurors were administered the supplemental oath of secrecy.

B.

During the virtual session in defendant's case, Jury Manager Seidl and three other grand jury staff members were present to ensure that no technical issues arose during the proceeding.[10] At the beginning of the session, the

---

[9] "When a grand jury authorizes an indictment, it returns a 'true bill.' When it declines to indict, it returns a 'no bill.'" State v. Shaw, 241 N.J. 223, 231 n.1 (2020) (quoting Wayne R. LaFave et al., 3 Criminal Procedure § 8.2(a) (4th ed. updated 2019)).

[10] At this proceeding, only four grand jurors required the use of electronic devices provided by the Judiciary.

18

prosecutor asked the grand jurors to express "[b]y a show of hands" whether any recognized the names of Detective Stephen Szbanz, the State's sole witness, or defendant Omar Vega-Larregui, and whether any were "unable to remain fair and impartial." This exchange followed:

> PROSECUTOR: I do not see any hands raised in the affirmative. And, at this point, everybody can hear and see me clearly, correct?
>
> (No audible response)
>
> PROSECUTOR: Okay. I see you nodding your heads indicating yes. Okay. . . . Does any member of the grand jury wish to have any portion of that law re-read?
>
> (No audible response)
>
> PROSECUTOR: I do not see any hands raised. . . .

The prosecutor then read the proposed indictment and asked the grand jurors whether they had any questions before she brought in the witness. When there was no audible response, the prosecutor stated, "No? Okay."

Detective Szbanz testified that on August 22, 2019, he was in uniform and on patrol in an unmarked vehicle when he observed a pickup truck parked on a sidewalk, blocking a number of garages. He approached several men standing nearby, and defendant stated that the pickup truck was his. The detective requested the vehicle's documents, and defendant proceeded to unlock the truck's passenger door, open the glove compartment, and shuffle

19

through papers. Defendant was visibly nervous, his hands were shaking, and he failed to produce any paperwork. When defendant reached underneath the passenger seat, the detective told him to stop, fearing he might reach for a weapon. Defendant did not obey the command. At that moment, Detective Szbanz also observed a sandwich bag on the floorboard containing a suspected controlled dangerous substance.

The detective pulled defendant from the truck and attempted to place him under arrest, but defendant resisted. With the assistance of responding officers, defendant was subdued and taken into custody. The sandwich bag with the suspected drugs was recovered and submitted to the New Jersey State Police Laboratory for analysis. The substance inside the bag tested positive for 29.982 grams (more than an ounce) of cocaine. Based on the packaging and amount of the cocaine, Detective Szbanz offered his opinion that defendant possessed the drugs with the intent to distribute. The detective also indicated that defendant possessed the cocaine within 500 feet of a public park.

About halfway through the prosecutor's questioning of the detective, the prosecutor asked if the grand jurors could hear clearly. When there was no audible response, the prosecutor said, "Okay. Good," and proceeded.

At the conclusion of his testimony, the detective exited from the virtual grand jury room. The prosecutor then made the following inquiries of the grand jurors:

> PROSECUTOR: Okay. Do any members of the grand jury have any questions for the witness?
>
> (No audible response)
>
> PROSECUTOR: Any questions on the law?
>
> (No audible response)
>
> PROSECUTOR: Okay. So the State is requesting a no bill on the charge of resisting arrest.
>
> UNIDENTIFIED SPEAKER: And if nothing further, the foreperson can ask if there was any technical.
>
> PROSECUTOR: You're muted, Michelle. You're saying something. I can't hear you.
>
> THE FOREPERSON: All right. Did anyone have any technical issues with hearing this case?
>
> (No audible response)
>
> THE FOREPERSON: No. Okay.
>
> UNIDENTIFIED SPEAKER: Okay. I'm going to share the screen. Can everyone see the indictment?
>
> GRAND JURORS: No.
>
> UNIDENTIFIED SPAKER: How about now?

21

GRAND JUROR:  No.

UNIDENTIFIED SPEAKER:  No?  Okay?  Let me see.

UNIDENTIFIED SPEAKER:  There we go.

UNIDENTIFIED SPEAKER:  Yeah, but that's not it, though.  Was that it?  How's that, do you see it?

UNIDENTIFIED SPEAKER:  Yup.

UNIDENTIFED SPEAKER:  Okay.  All right . . . .  No other questions or concerns?

(No audible response)

UNIDENTIFIED SPEAKER:  No?  Okay.

An "unidentified speaker" reminded the grand jurors that they were not to speak with anyone, even friends or family, about the grand jury hearing and that any unauthorized disclosure of information was "a crime punishable by up to 18 months [of] imprisonment."  The grand jury then proceeded to the virtual "deliberation room" and returned a four-count indictment, charging defendant with third-degree possession of cocaine, second-degree possession of cocaine with intent to distribute, second-degree possession of cocaine with intent to

22

distribute within 500 feet of a public park, and fourth-degree obstructing the administration of law or other governmental function, N.J.S.A. 2C:29-1(b).[11]

The grand jury session ended with the grand jury foreperson asking, "Did anyone have any technical issues with that vote?" After there was no audible response, the foreperson said, "No," and an unidentified speaker also said, "No."

In a certification, Jury Manager Seidl later averred that the foreperson conducted a "pre-deliberation technology check" with the grand jurors to ensure that they had not "experienced any technical problems that affected their ability to hear and/or observe the proceedings" and a "post-vote technology check" to ensure that they did not have "any technical problems that affected their ability to deliberate and vote."

### C.

Defendant entered a plea of not guilty to the charges in the indictment. On November 10, 2020, defendant filed a motion in the Law Division to dismiss the indictment on the basis that the virtual grand jury presentation did not "adhere to constitutional norms" and that the State failed "to present clearly exculpatory information" during the presentation. More particularly,

---

[11] The prosecutor was not present in the virtual deliberation room.

23

defendant argued that this Court exceeded its constitutional rulemaking authority by convening a virtual grand jury.

Defendant invited the Association of Criminal Defense Lawyers of New Jersey (ACDL) to intervene as amicus curiae, given the statewide constitutional implications of the virtual grand jury format. With the consent of the State and defendant, the Law Division granted the ACDL leave to participate as amicus curiae and to address defendant's motion challenging "the constitutionality of virtual grand juries." Defendant indicated that he would join the arguments presented by the ACDL.

## D.

On January 13, 2021, in accordance with Rule 2:12-1, this Court certified directly for its review only defendant's constitutional challenge to the grand jury presentation in the virtual format. The Court allowed the ACDL to retain its amicus status. The Court also granted the Attorney General of New Jersey and the New Jersey State Bar Association leave to appear as amici curiae.

## III.

Defendant, the ACDL, and the State Bar Association -- like the State and the Attorney General -- have filed separate briefs but advance many of the

24

same arguments.  To avoid repetition, for the most part, we present their respective arguments collectively.

A.

Defendant and amici contend that the right to a fair grand jury presentation guaranteed by our State Constitution is violated when an indictment is returned by a grand jury performing its duties virtually.  In the virtual format, they claim, the oath of grand jurors alone is not sufficient to assure the secrecy of grand jury proceedings because the jurors are participating from their homes or other private locations and may -- despite instructions not to do so -- conduct their own factual or legal research using smart phones, record the proceedings, or allow others to have access to the hearing itself.

Defendant and amici also assert that virtual grand juries will not represent a fair cross-section of the community because minority, poor, and elderly populations are less likely to have access to internet devices, thereby creating an intolerable "digital divide."  They maintain that technological problems arising from the virtual format are rife and undermine the integrity of the grand jury presentation, as evidenced in this case by "unidentified speakers," the acceptance of "no audible response" as a silent assent to a question, and the possibility that individual grand jurors had connectivity

issues or did not know how to unmute to pose a question or raise an issue. The virtual presentation, they profess, denies grand jurors a meaningful opportunity to participate in the hearing.

The ACDL separately asserts that defendant's equal protection rights were violated by the Judiciary "selectively implementing" the virtual grand jury program in only two counties initially. The ACDL reasons that defendant was singled out for disparate treatment when his case was presented for indictment when other cases, including those of detained defendants, were not. The ACDL also faults this Court for overstepping its constitutional rulemaking authority and breaching the separation of powers by adding to the legislative qualifications for grand juror service the capacity to remotely participate in proceedings.

Last, the State Bar Association and the ACDL call on this Court to declare a moratorium on grand jury proceedings until they can return to an in-person format.

B.

In contrast, the State and amicus Attorney General (collectively, State) submit that the virtual grand jury -- a response to a life-threatening pandemic -- has kept the criminal justice system in operation and honored the dictates of our State Constitution and notions of fundamental fairness. The State

26

emphasizes that safeguards have ensured the integrity of the virtual grand jury process: grand jurors are trained in the technology needed to participate in virtual proceedings; they are advised that a violation of their oath of secrecy will lead to criminal sanctions; and they are monitored by Judiciary staff so that improper access to proceedings and technical glitches do not occur.

The State rejects defendant's presumption that grand jurors cannot be expected to obey their oath to keep grand jury proceedings secret or to abstain from using electronic devices to conduct private research and investigations. According to the State, the argument that jurors will defy their oaths is based on nothing more than speculation and has no factual support.

The State also asserts that no evidence in the record suggests that the virtual grand jury selection process does not produce a fair-cross section of the community or that a constitutionally cognizable group has been excluded from participating. The State contends that no juror has been excluded from serving based on a lack of technology and that, in the present case, the Judiciary provided five members of the grand jury tablets to participate in the virtual sessions.

In addition, the State insists that no technical issues arose during the grand jury presentation in this case that would place in question the fairness of the proceedings. It also maintains that the grand jury is an arm of the court,

and therefore this Court exercised its constitutional rulemaking authority in implementing the virtual format.

Last, the State denies that the presentation of defendant's case to a virtual grand jury in a two-county pilot program before the program was extended statewide and before the cases of some detained defendants violated defendant's right to equal protection.

IV.

A.

In addressing the facial constitutional challenge to virtual grand juries and the specific challenge to the virtual grand jury presentation in this case, we begin with Article I, Paragraph 8 of the New Jersey Constitution. That provision guarantees that "[n]o person shall be held to answer for a criminal offense, unless on the presentment or indictment of a grand jury." N.J. Const. art. I, ¶ 8.

An accused's right to a grand jury presentation has deep roots in the English common law, long predating the adoption of New Jersey's first Constitution in 1776 and the United States Constitution in 1787. See State v. Shaw, 241 N.J. 223, 235-36 (2020) (detailing the historical development of the grand jury). The right to a grand jury presentation was guaranteed by New Jersey's 1776 Constitution, through its general adoption of the English

28

common law, and by the Fifth Amendment of the Federal Constitution.[12]  Id. at

237; see also State v. Rockafellow, 6 N.J.L. 332, 339 (Sup. Ct. 1796)

("Without a legal presentment, no man can, under our administration of the

laws, be tried for any heinous offence . . . ."), overruled in other part, In re

Pub. Highway, 22 N.J.L. 293 (Sup. Ct. 1849).  The right to a grand jury

presentation in the current New Jersey Constitution first appeared in similar

language in Article I, Section 9 of the 1844 Constitution.  Bd. of Health of

Weehawken Twp. v. N.Y. Cent. R.R. Co., 10 N.J. 294, 304 (1952).

To this day, the grand jury "occupie[s] a high place as an instrument of

justice in our system of criminal law."  State v. Del Fino, 100 N.J. 154, 165

(1985).  The grand jury fulfills the dual purpose "of determining if there is

probable cause to believe that a crime has been committed and of protecting

citizens against unfounded criminal prosecutions."  Ibid. (quoting Branzburg v.

Hayes, 408 U.S. 665, 686-87 (1972)).  "The indictment requirement of Article

1, Paragraph 8, is a constitutional protection that enhances the integrity of the

---

[12]  The Fifth Amendment provides that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury."  U.S. Const. amend. V.  That provision of the Fifth Amendment does not apply to the states, however.  See Branzburg v. Hayes, 408 U.S. 665, 688 n.25 (1972).  Indeed, most states have abandoned the use of grand juries and institute charges by way of information.  See Shaw, 241 N.J. at 237; see also  Wayne R. LaFave et al., 4 Criminal Procedure § 15.1(d) (4th ed. updated 2020).

charging process," In re Grand Jury Appearance Request by Loigman, 183 N.J. 133, 139 (2005), and infuses our system of justice "with a democratic ethos" because ordinary citizens serve as grand jurors, ibid. (quoting State v. Fortin, 178 N.J. 540, 638 (2004)).

A grand jury presentation, however, is not a trial. The accused has no right to appear before the grand jury or participate in the grand jury process. See Robert Ramsey, Criminal Practice and Procedure, 31 N.J. Practice Law Series § 21.7 (2021). Unlike at a trial, a defendant has no right to present evidence or confront the witnesses against him at a grand jury proceeding. See ibid.; see also Loigman, 183 N.J. at 143.

Although the language of Article I, Paragraph 8 does not speak of the right to an in-person grand jury presentation, those who drafted that constitutional provision and the same provision in the 1844 Constitution obviously presumed that grand jurors would meet together in the same room. They likely did not conceive of the technology that today allows for virtual telemedicine examinations, virtual classrooms, or virtual grand juries. They also did not likely foresee the lethal effects of an airborne virus that would kill more than a half-million Americans and that would call for a public health response requiring, to the extent possible, personal isolation to stop the spread of the deadly pandemic.

This Court's temporary suspension of in-person grand juries and jury trials was a public health imperative -- a step necessitated to protect jurors, prosecutors, and court staff from potential serious illness and death. The suspension of grand juries, however, delays the criminal justice process with serious implications for the accused, whether detained or released pretrial, and the State. Suspension of grand juries means that some detained defendants, whose charges might be dismissed by the grand jury, will remain incarcerated for longer periods than otherwise necessary. See, e.g., Haley v. Bd. of Review, ___ N.J. ___, ___ (2021) (slip op. at 4) (noting that the defendant spent two months in custody until his charges were dismissed by a grand jury). The right of the accused to a speedy trial is also deferred -- and no doubt some will argue violated -- by not keeping grand juries in session.

The State, moreover, has an interest in securing testimony while the memories of witnesses are fresh and in convening investigative grand juries with the power to subpoena witnesses to ferret out criminal activities -- and in bringing justice to victims with all due speed.

When the Court entered its first Order temporarily suspending grand jury sessions, it could not know the duration of the pandemic, the death toll it would reap, or whether an effective vaccine or treatment would be developed within a year or much longer. Confronting the Court was whether the

Constitution required a shutdown of the criminal justice system for an indeterminate period while arrests continued and detentions climbed.

The question is whether all of the essential attributes of the right to a grand jury presentation can be preserved through a virtual format so that the grand jury can function and fulfill its historic purpose, in the way intended by the drafters of our Constitution, in the midst of an unprecedented public health emergency. In answering that question, we must remember that the framers of our State Constitution, like the framers of the Federal Constitution, created a founding charter "intended to endure for ages to come, and consequently, to be adapted to the various crises of human affairs," see McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 415 (1819) -- a charter capable of adapting "to a future that [could] only be 'seen dimly,' if at all," see NLRB v. Noel Canning, 573 U.S. 513, 534 (2014) (quoting McCulloch, 17 U.S. at 415).

## B.

We begin with an indisputable legal principle: "[t]he grand jury is a judicial, investigative body, serving a judicial function" and "is an arm of the court." Loigman, 183 N.J. at 141; State v. Haines, 18 N.J. 550, 557 (1955) ("The grand jury, at common law, is an arm of the court and acts for the court under which it is organized, and its proceedings are regarded as proceedings in the court." (quoting O'Regan v. Schermerhorn, 25 N.J. Misc. 1, 19-20 (Sup.

32

Ct. 1946))). Indeed, "[n]ot only is the grand jury an arm of the court in New Jersey, but the Judiciary also exercises supervisory authority over grand juries" to ensure that grand jury proceedings are fundamentally fair. Shaw, 241 N.J. at 242.

Our supervisory authority over the grand jury derives from the New Jersey Constitution, which provides that "[t]he Supreme Court shall make rules governing the administration of all courts in the State and, subject to the law, the practice and procedure in all such courts." N.J. Const. art. VI, § 2, ¶ 3. The Constitution also designates the Chief Justice as the "administrative head of all the courts in the State." Id. § 7, ¶ 1. "Those two provisions give the Chief Justice and the Supreme Court sweeping authority to govern their own house," In re P.L. 2001, Chapter 362, 186 N.J. 368, 379 (2006), a house that includes the grand jury.

Our "Court's administrative authority is 'far-reaching' and 'encompasses the entire judicial structure [as well as] all aspects and incidents related to the justice system,'" including "'all facets of the internal management of our courts.'" Id. at 381 (alteration in original) (first quoting Knight v. City of Margate, 86 N.J. 374, 387 (1981); and then quoting Lichter v. County of Monmouth, 114 N.J. Super. 343, 349 (App. Div. 1971)). That authority extends to the power to promulgate rules and issue directives governing the

33

grand jury. Ibid.; see also Haines, 18 N.J. at 558-59 (affirming the Court's power to adopt a rule concerning "the continuance of terms of a grand jury"). Because of the constitutional power Article VI vests in the Supreme Court, its "administrative rulemaking authority cannot be circumscribed by legislation." In re P.L. 2001, 186 N.J. at 381.

The New Jersey Rules of Court set forth comprehensive guidelines and procedures governing almost every aspect of the grand jury process. R. 3:6-1 to -11. Those Rules cover details regarding the summoning of the grand jury; the making of objections to the array of the grand jury or individual grand jurors; the supervision and charging of the grand jury; the appointment of a foreperson and deputy foreperson; the duties of the clerk of the grand jury; the persons who may be present during grand jury proceedings; how a record and transcript are to be made and retained; the secrecy of grand jury proceedings; the finding and returning of indictments and no-bills and the finding and returning of presentments; the discharging of a grand jury and continuance of a grand jury's term; and the empanelment and supervision of the State Grand Jury. Ibid.

We acknowledge that county grand juries and the State Grand Jury are also the subject of legislation that, in many instances, overlaps with our court rules. See N.J.S.A. 2B:21-1 to -10 (laws pertaining to county grand juries);

N.J.S.A. 2B:22-1 to -9 (laws pertaining to the State Grand Jury). The Legislature, however, has spoken on topics not covered by our Court Rules, such as setting forth the qualifications for service on a grand jury, N.J.S.A. 2B:20-1; the oath to be taken by grand jurors, N.J.S.A. 2B:21-3; and the criminal penalty for purposely disclosing information concerning a grand jury proceeding, N.J.S.A. 2B:21-10. Some aspects of the overall legislation are clearly procedural and some substantive. It is not uncommon for the Judiciary and Legislature to share spheres of responsibility in areas of mutual concern, as exemplified by the adoption of court rules and legislation regarding evidence rules, e.g., State v. Byrd, 198 N.J. 319, 342 (2009), and the Pretrial Intervention Program, e.g., State v. Johnson, 238 N.J. 119, 128 (2019).

In exercising our constitutional supervisory authority over the courts, we may "permit or accommodate the lawful and reasonable exercise of the powers of other branches of government even as that might impinge upon the Court's constitutional concerns in the judicial area." Knight, 86 N.J. at 391. "The purpose of the separation of powers doctrine is not to create three 'watertight' governmental compartments, stifling cooperative action among the" three branches of government. In re P.L. 2001, 186 N.J. at 379. Thus, we act with restraint when legislation, touching on the judicial sphere, advances "a significant governmental purpose" and does "not interfere with the Supreme

35

Court's administration of the court system." Id. at 384 (quoting Knight, 86 N.J. at 391-93, 394-95).

Here, in authorizing grand juries to operate in a virtual format for a temporary period during an unprecedented public health emergency, the Court is exercising a quintessential judicial power that is not in any way in conflict with legislative enactments concerning the grand jury. We reject the ACDL's argument that this Court's rulemaking authority has tread on a "field of the substantive law" reserved to the Legislature. See Winberry v. Salisbury, 5 N.J. 240, 248 (1950). We also reject the ACDL's more particularized claim that service on a virtual grand jury requires a juror qualification at odds with N.J.S.A. 2B:20-1.

N.J.S.A. 2B:20-1 sets forth the qualifications for jury service: age, citizenship, and residency requirements; the ability to read and understand the English language; lack of an indictable criminal conviction; and lack of a mental or physical disability that would prevent service as a juror. The ACDL raises the illusory issue that the Court has made "reliable internet access, technology, and technological know-how" a new "extra-statutory" qualification for grand jury service.

First, where the grand jury convenes -- customarily in a courthouse -- is clearly a matter of procedure. See generally R. 1:2-1. Under the emergent

circumstance prompted by the pandemic, the grand jury temporarily convenes in a virtual format. Second, the record plainly reveals that "[n]o juror has been excluded from selection or from serving on a virtual grand jury based on lack of technology." The Judiciary provides not only tablets with broadband internet capacity to grand jurors who do not have the available technology, but also technical assistance in setting up and using the tablet. In this case, the Judiciary made available tablets to five grand jurors who indicated a willingness to serve but lacked reliable personal technology to participate in a virtual proceeding. All grand jurors, moreover, receive training to participate in virtual proceedings using Zoom. Providing tablets to grand jurors -- like providing interpreters for non-English speakers and listening devices to the hearing impaired -- is akin to other accommodations afforded by the Judiciary so that all can participate and have equal access to the courthouse.

Whatever digital divide existed has been bridged by the Judiciary's provision of the necessary technology and technological know-how to grand jurors.

C.

Defendant and his supporting amici allege that the very nature of a virtual grand jury session is incompatible with the secrecy requirements mandated by our Court Rules. See R. 3:6-7 (providing that "the requirement

37

as to secrecy of proceedings of the grand jury shall remain as heretofore" and that all grand jurors "shall be required to take an oath of secrecy before their admission" to a grand jury session); see also N.J.S.A. 2B:21-3 (requiring grand jury members to swear or affirm that they "will keep secret the proceedings of the grand jury"). To be sure, "the proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings." Douglas Oil Co. of Cal. v. Petrol Stops Nw., 441 U.S. 211, 218 (1979).

"One of the foundations of our jury system is that the jury is presumed to follow the trial court's instructions." State v. Burns, 192 N.J. 312, 335 (2007). The premise of defendant's and amici's argument is that virtual grand jurors cannot be trusted to obey their oaths or follow instructions, even on penalty of severe sanctions. In effect, they urge that we discard the presumption that virtual grand jurors will act in accordance with their lawful duties. Because defendant and amici have no sound evidence to support their premise of virtual grand juror irresponsibility, they have resorted to speculation and hypothetical scenarios.

Defendant and amici hypothesize that grand jurors -- in the privacy of their homes -- will do online research with their smartphones, surreptitiously record the proceedings, talk to their families or friends about the case, and perhaps give unauthorized access to the virtual grand jury room. They give

38

little credit to the repeated reminders given to the grand jurors about the sanctity of the proceedings and serious penalties they would face for a violation of their oath of secrecy. See N.J.S.A. 2B:21-10 (stating that unauthorized disclosures may be punishable as a fourth-degree crime). Nor do they fully take into account the diligent efforts by Judiciary staff to monitor compliance, such as requiring jurors to perform a 360-degree scan of their location with their electronic devices.

In the end, there is no perfect system of verification, and we must rely on the good faith of all grand jurors and all trial jurors to follow instructions and obey their oaths -- and in those instances when violations occur, hold the offending jurors accountable. We cannot guarantee that a petit juror during a trial will not go home and do research or speak to a spouse or a friend about a case. We cannot guarantee that a juror will not smuggle an audio recording device into the grand jury room or go home and reveal the names of the witnesses and target of the investigation. We presume that those jurors will follow instructions and obey their oaths. Our confidence in our system of justice is proportionate to our faith in those jurors.

Defendant and amici have given this Court no basis -- other than utter conjecture -- for concluding that virtual grand jurors are less trustworthy and less honorable than other grand jurors and petit jurors.

D.

1.

Likewise, defendant's and amici's argument that a virtual grand jury does not represent a cross-section of the community is based wholly on supposition. They have provided no evidence to contradict the fact-based certifications in the record that virtual grand juries are not only drawn in the same manner as in-person grand juries, but also that no person is excluded from grand jury service based on lack of technology or internet capacity.

A grand jury that represents a cross-section of the community provides "a democratic safeguard to our judicial system" and is infused with "the common wisdom of ordinary citizens to make the important fact-finding decisions that must precede the filing of an indictment." Fortin, 178 N.J. at 638. Impartially selecting a grand jury that mirrors a fair-cross section of the community "demands that each person have an equal chance of serving." State v. Ramseur, 106 N.J. 123, 231 (1987).

To establish a prima facie claim that the grand jury selection process violated the fair-cross-section requirement or the right to equal protection,[13] a

_____

[13] Article I, Paragraph 1 of the New Jersey Constitution provides that "[a]ll persons . . . have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness." We have construed the "expansive language" of Article I, Paragraph 1 as

40

defendant must show, through statistical evidence or through inferences drawn from a discriminatory selection procedure, substantial underrepresentation of "a constitutionally cognizable group." State v. Coyle, 119 N.J. 194, 213 (1990).

Defendant and amici have provided no evidence that the grand jury in this case did not represent a fair cross-section of the community. First, the statewide Manager of Jury Programs averred that the process of summoning jurors for grand jury selection "has remained largely unchanged" for virtual grand juries. Prospective grand jurors are mailed a juror summons postcard that identifies the internet site at which the juror can complete their questionnaire. If they do not respond to the questionnaire online, they are mailed a hard copy questionnaire. Deputy Attorney General Shanahan, moreover, has attested that, statistically, the number of potential jurors available for virtual State Grand Juries is "not significantly different" from those before the pandemic.

---

guaranteeing every person equal protection under the law. See, e.g., Sojourner A. v. Dep't of Human Servs., 177 N.J. 318, 332 (2003); Lewis v. Harris, 188 N.J. 415, 442 (2006). The equal-protection guarantee is intended "to protect against injustice and against the unequal treatment of those who should be treated alike." Greenberg v. Kimmelman, 99 N.J. 552, 568 (1985).

Second, the grand jurors in this case were selected in pre-pandemic days when in-person grand juries were still in session. When the Court authorized virtual grand juries and the present panel transitioned to virtual sessions, the Judiciary provided to five grand jurors tablets with, if necessary, internet access so that every juror could continue to serve and participate. No one on this grand jury panel was excluded from serving based on lack of personal technology.

The certifications of the statewide Manager of Jury Programs, the Jury Manager of the Mercer Vicinage, and the Acting Attorney Supervisor of the State Grand Jury indicate that no person called to serve on virtual grand juries throughout the state has been excluded for lack of technological equipment or means. Those in need of the necessary technology are provided with tablets and training to effectively participate.

Had this Court not followed health-safety protocols and kept in place in-person grand juries during the pandemic -- presuming a public facility could effectively accommodate the required social distancing of masked grand jurors -- it is not likely that vulnerable populations, such as the elderly and those with underlying conditions, would have appeared for service at the risk of their lives. In-person grand juries -- not virtual grand juries -- would have likely caused the underrepresentation decried by defendant and amici. On the other

42

end of the spectrum, an indeterminate moratorium on all grand jury presentations would have caused adverse consequences for those seeking to be cleared of charges, for those seeking to be afforded speedy trials, and for victims looking to have their perpetrators brought to justice without undue delays.

New Jersey has not been the only State to authorize virtual grand jury proceedings during the pandemic. Five of the seventeen other states that "still require a grand jury indictment for serious offenses," Shaw, 241 N.J. at 237; see also Wayne R. LaFave et al., 4 Criminal Procedure § 15.1(d) (4th ed. updated 2020), have authorized virtual grand jury proceedings in response to the COVID-19 pandemic. See, e.g., Alaska, Sup. Ct. of Alaska, Special Order of the Chief Justice No. 8204: Update Regarding Authorizing Videoconference Grand Jury Proceedings (Nov. 2, 2020); Georgia, Sup. Ct. of Ga., Eighth Order Extending Declaration of Statewide Judicial Emergency (Nov. 9, 2020); Kentucky, Sup. Ct. of Ky., Order 2020-40 -- In Re: Kentucky Court of Justice Response to COVID-19 Emergency: Expansion of Court Proceedings (May 19, 2020); South Carolina, Sup. Ct. of S.C., Operation of the Trial Courts During the Coronavirus Emergency (Apr. 22. 2020); Texas, Sup. Ct. of Tex., Twenty-Ninth Emergency Order Regarding the COVID-19 State of Disaster (Nov. 11, 2021).

43

In the midst of this worldwide and national pandemic, New Jersey has not been alone in crafting temporary remedies -- consistent with constitutional rights -- to keep the criminal justice system moving as new cases mount and old cases stagnate.

2.

Defendant and the ACDL contend that by "selectively implementing" the Virtual Grand Jury Pilot Program first in Mercer and Bergen Counties and not allowing defendant to await an in-person presentation like similarly situated criminal defendants, the Judiciary denied him his right to equal protection of the law. In light of our conclusion that a virtual grand jury -- convened under the emergent circumstances of a deadly pandemic -- does not run afoul of the constitutional right to a grand jury presentation, defendant can hardly complain that having his constitutional right vindicated too soon and before others violates his equal protection rights.[14] Virtual grand juries, moreover, are now operating in all twenty-one counties, so defendant's disparate-treatment argument -- if it ever had legitimacy -- falls away.

The purpose of having a pilot program, such as for virtual grand juries or drug courts, is to ensure the efficacy of the program before implementing it

---

[14] Contrary to defendant's assertion, no limitation has been placed on the types of criminal cases that could be presented to a virtual grand jury.

statewide.  Pilot programs by their very nature may apply to a subset of a much larger population.  For example, drug courts began in Essex County and Camden County and, over time, expanded statewide.  See N.J. Courts, Drug Courts, https://njcourts.gov/courts/criminal/drug.html?lang=eng (last visited Apr. 21, 2021).  The use of a pilot program, as here, did not create an impermissible or unlawful classification and advanced a legitimate constitutional objective, thus satisfying the rational-basis test for such a program.  See State v. Bianco, 103 N.J. 383, 398 (1986) (holding that the Excessive Sentencing "Pilot Program, by singling out excessive sentence appeals for disposition with oral argument but without briefs . . . rationally furthered the State's interest of securing prompt justice for all" and did not violate the defendant's equal protection rights).

## V.

## A.

Defendant and supporting amici argue that that the inherent limitations and shortcomings of technology fatally undermine the integrity of virtual grand jury proceedings and render them fundamentally unfair under New Jersey law.  They reason that, in the setting of a virtual grand jury, technological deficiencies, as illustrated in the particular case before us, obstruct one of the core functions of the grand jury -- to be "present or

45

informed of the evidence at each session in order to vote or to indict," citing Del Fino, 100 N.J. at 164-65.

We find that the concerns raised by defendant and amici, for the most part, are overstated and grounded in conjecture, not in the reality of the many thousands of virtual judicial proceedings successfully conducted -- despite occasional glitches -- over the course of the pandemic. We acknowledge that the use of technology, like all human undertakings, will not meet the test of perfection. Nevertheless, we conclude that virtual grand jury proceedings comply with the essential tenets of the fundamental fairness doctrine.

"New Jersey's doctrine of fundamental fairness 'serves to protect citizens generally against unjust and arbitrary governmental action, and specifically against governmental procedures that tend to operate arbitrarily.'" Doe v. Poritz, 142 N.J. 1, 108 (1995) (quoting Ramseur, 106 N.J. at 377 (Handler, J., dissenting)). The doctrine is "an integral part of due process," Shaw, 241 N.J. at 239 (quoting State v. Saavedra, 222 N.J. 39, 67 (2015)), and promotes the values of "fairness and fulfillment of reasonable expectations in the light of the constitutional and common law goals," Saavedra, 222 N.J. at 68. The fundamental fairness doctrine, however, is "applied 'sparingly,' only when 'the interests involved are especially compelling.'" Shaw, 241 N.J. at 239-40 (quoting Poritz, 142 N.J. at 108).

46

B.

Defendant and amici point out the various technological problems that can arise during a virtual grand jury proceeding -- or any virtual proceeding for that matter: a frozen video screen, imperfect audio, insufficient signal strength and connectivity issues, all capable of causing a grand juror to miss key testimony. A virtual proceeding, it is claimed, "does not capture all of the cues so vital to judging credibility." Defendant, moreover, presents anecdotal examples from a news article about a grand juror who purportedly dropped off a video feed and one who could not hear a witness's testimony.

However, the hypothetical technological concerns raised by defendant and amici, as well as the secondhand account from a news article, are addressed in certifications filed by the statewide Manager of Jury Programs, the Mercer Vicinage's Jury Manager, and the Acting Attorney Supervisor of the State Grand Jury. Those certifications detail what actually occurs before, during, and after a virtual grand jury presentation to ensure that grand jurors were present during the proceeding, heard the evidence, and voted. Those certifications spell out that grand jurors are extensively trained to participate in virtual grand jury sessions and advised to report technical problems to Judiciary staff. Those certifications describe how Judiciary staff and

47

prosecutors patrol and monitor the virtual grand proceedings to detect and correct technological issues.

No one suggests that technology does not present challenges in the virtual setting. In Mercer County, for example, grand jurors are given the contact information for grand jury and IT staff and instructions to call if they have any technical issues. Experience and common sense also tell us that if a grand juror's screen is frozen or the grand juror falls off the feed, that will be noticed -- by the affected grand juror, by other grand jurors, by Judiciary staff, and by the prosecutor. If grand jurors have a problem hearing, presumably they will follow instructions and advise Judiciary staff. If a grand juror attempts to speak and gets no response, that will be a cue for the juror to unmute -- or if others see the juror's lips moving and hear no sound, they will tell the juror to unmute.

Defendant also raises the question of whether grand jurors can assess the credibility of a witness in the virtual format. Yet judges do so in remote proceedings in many contested matters, such as testimonial hearings, municipal court trials, and even civil jury trials. See also Ramsey, § 21.7 ("The grand jury process is not a mini-trial where issues related to credibility are decided.").

48

The technological problems that may arise in the virtual grand jury setting are common to all virtual proceedings -- even live-streamed New Jersey Supreme Court virtual oral arguments. Those problems have not deterred the thousands of virtual proceedings that have permitted the New Jersey Judiciary to keep the doors to the virtual courthouse open in the time of a pandemic. Because the virtual process may not be perfect does not mean that it is not mostly effective or unconstitutional. Certainly, technological glitches or defects will require individually tailored solutions. A defendant will not be without a remedy if such problems render grand jurors not present or informed about the evidence during a virtual grand jury session.

We reject the notion that virtual grand jury proceedings facially violate the fundamental fairness doctrine or the New Jersey Constitution.

C.

We now turn to the virtual grand jury proceeding in this case. Our review of the grand jury transcript leads us to conclude that, viewed in its entirety, the proceeding did not violate the fundamental fairness doctrine or defendant's constitutional right to a fair grand jury presentation. We nonetheless recognize that some simple steps can be taken to further safeguard and inspire confidence in the integrity of virtual grand jury proceedings.

49

At the beginning of the grand jury proceeding, the prosecutor asked, "by a show of hands," whether any grand juror recognized the name of defendant or the State's only witness and affirmed for the record that no hands were raised; she then asked whether the jurors "can hear and see me clearly," and indicated she saw no hands raised. As in typical in-person grand jury presentations, the prosecutor relied on silence as an answer. For example, the prosecutor asked the grand jurors whether they had any questions about the proposed indictment, or for Detective Szbanz after he testified, or on the law; and the prosecutor relied on the jurors' silence ("no audible response") as their response that they had none.

It is true that if the grand jurors did not hear the question, because of a technical malfunction, they arguably would not be in a position to respond. But the grand jurors were trained to report technical issues to the grand jury staff, and presumably if they saw the prosecutor's lips moving and heard no sound, they would know that there was a problem. Judiciary staff monitored the proceedings as well. In addition, following protocol, before the jurors deliberated in the breakout room, the foreperson asked the jurors whether any experienced a problem that affected their ability to observe or hear the proceedings. We are mindful that even in an in-person grand jury session, a

50

juror may be daydreaming or distracted, but the existence of such human frailties does not indicate an institutional failing in our system of justice.

In the future, to remove any doubt about a virtual grand juror's response to a question, the prosecutor should require a clear indication for the record, such as an audible response or a showing of hands.

Also, during the colloquy about whether the grand jurors could see the indictment, the transcript reveals an "unidentified speaker" making such comments as, "Can everyone see the Indictment?"; "How about now?"; "All right . . . . No other questions or concerns?"; and "No. Okay." We reject the contention of defendant and amici that the exchange, in its totality, suggested that the grand jurors did not see the indictment. That contention is further refuted by the foreperson's post-vote technology check.[15] Additionally, the Mercer Vicinage Jury Manager certified that the grand jurors reported no technical difficulties. Last, the grand jurors were not neophytes; they had participated in three previous virtual grand jury sessions and knew their roles.

Nevertheless, going forward all persons speaking on the record should identify themselves or be identified. Everyone participating in the virtual

---

[15] In all likelihood, the "unidentified speaker" was a member of the grand jury IT staff.

grand jury process should remember that the record must clearly reflect who is speaking and the responses to any questions.

All in all, defendant received a grand jury hearing that comported with basic tenets of fundamental fairness and the constitutional right to a fair grand jury presentation. We therefore deny his motion to dismiss the indictment on the grounds addressed in this opinion and remand to the trial court for further proceedings.

VI.

A few final words. Virtual grand juries are a temporary measure invoked to meet an extraordinary, life-threatening public health crisis. On March 9, 2020, New Jersey reported eleven presumed positive cases of COVID-19. See Exec. Order No. 103 (Mar. 9, 2020), 52 N.J.R. 549(a) (Apr. 6, 2020). A little more than a year later, as of April 19, 2021, New Jersey reported 22,551 confirmed deaths and an additional 2,592 probable deaths related to COVID-19 -- and 858,519 confirmed cases and 120,334 probable cases. N.J. Dep't of Health, New Jersey COVID-19 Dashboard: Cases and Trends, https://www.nj.gov/health/cd/topics/covid2019_dashboard.shtml. On April 19, 2021, there were 2,109 COVID-19 patients hospitalized, with 435 in intensive care and 254 on ventilators in this state. N.J. Dep't of Health, New Jersey COVID-19 Dashboard: Hospital Census, https://www.nj.gov/health

52

/cd/topics/covid2019_dashboard.shtml.  Up to that date, 563,890 people had died from COVID-19 in the United States.  Ctrs. for Disease Control & Prevention, COVID Data Tracker, https://covid.cdc.gov/covid-data-tracker. New Jersey has suffered the highest per capita death rate in the country during the course of the pandemic.

Those staggering statistics give some understanding of the dimension of the crisis faced by the Judiciary and all New Jersey residents.  Yet as life goes on, the criminal and civil justice system cannot stand still.  No one could predict how long the pandemic would last.  The Judiciary -- like educational institutions, government operations, and businesses -- transitioned to a virtual format during this grim period.  Through the cooperative efforts of judges, Judiciary staff and IT personnel, along with lawyers and litigants, many thousands of remote hearings have been conducted in our criminal and civil justice system.  Indeed, the Administrative Office of the Courts has reported that between March 16, 2020 and April 20, 2021, 175,073 virtual court events have been conducted involving over 2 million participants.

Since the beginning of the pandemic, more than 6,000 cases have been presented to virtual grand juries.  The Judiciary has endeavored to maintain all the essential attributes of the grand jury in the virtual format, so that the grand jury retains its high, preferred place in our constitutional framework.  As

53

millions of New Jersey residents continue to receive vaccinations, we look forward in the near future to a return to normalcy and to reopened courthouses -- and to grand jurors sitting together in the same room where testimony is taken.

        **CHIEF JUSTICE RABNER** and **JUSTICES LaVECCHIA, PATTERSON, FERNANDEZ-VINA, SOLOMON,** and **PIERRE-LOUIS** join in **JUSTICE ALBIN**'s opinion.